IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ROBERT WILLIAM TEAR, § | |
| Petitioner, § | |
| VS. § | NO. 3-06-CV-1893-O |
| NATHANIEL QUARTERMAN, Director § Texas Department of Criminal Justice, § Correctional Institutions Division § | |
| Respondent. § | |

**FINDINGS AND RECOMMENDATION OF THE**
<u>**UNITED STATES MAGISTRATE JUDGE**</u>

Petitioner Robert William Tear, a Texas prisoner, has filed an application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons stated herein, the application should be denied.

I.

Petitioner was charged in a two-count indictment with the aggravated sexual assault of his four year-old son. The first count alleged that petitioner digitally penetrated the child's anus. The second count alleged that petitioner placed his mouth on the child's penis. A jury convicted petitioner on both counts of the indictment and sentenced him to 10 years confinement, probated for 10 years, on the first count and 15 years confinement on the second count. His conviction and sentence were affirmed on direct appeal. *Tear v. State*, 74 S.W.3d 555 (Tex. App.--Dallas 2002, pet. ref'd), *cert. denied*, 123 S.Ct. 1753 (2003). Petitioner also filed an application for state post-conviction relief. The application was denied without written order. *Ex parte Tear*, No. WR-58,088-01 (Tex. Crim. App. Jun. 28, 2006). Petitioner then filed this action in federal district court.

II.

In three grounds for relief, petitioner contends that he received ineffective assistance of counsel because his attorney: (1) failed to subpoena MaLisa Fyffe, a speech therapist, to testify about the child's expressive disorder; (2) did not call Linda Scott, a pediatric nurse, who would have supported petitioner's medical care defense; and (3) did not object to the expert testimony of Suzanne Faulkner, a clinical therapist at the Denton County Children's Advocacy Center.

A.

The Sixth Amendment to the United States Constitution guarantees a defendant reasonably effective assistance of counsel at all critical stages of a criminal proceeding. *See Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). To prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonable professional conduct. *Id.*, 104 S.Ct. at 2064. Second, the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, 104 S.Ct. at 2068.

Where, as here, a state court has already rejected an ineffective assistance of counsel claim, a federal court may grant habeas relief only if the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 411-13, 120 S.Ct. 1495, 1522-24, 146 L.Ed.2d 389 (2000). A state court decision is contrary to clearly established federal law if "it relies on legal rules that directly conflict with prior holdings of the Supreme Court or if it reaches a different conclusion than the Supreme Court on materially indistinguishable facts." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir.), *cert. denied*, 124 S.Ct. 2812 (2004), *citing Williams*, 120 S.Ct. at 1523. A decision constitutes an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 120 S.Ct. at 1523; *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001). Factual determinations made by state courts are presumed to be correct and are unreasonable only where the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

B.

The state's case against petitioner was based primarily on outcry statements made by the child after being removed from his home by Child Protective Services ("CPS").[1] One outcry witness, Kathleen Hoffman, testified that the child and his two year-old brother came to live with her family on December 10, 1999. (SF-II at 67). Later that month, the child complained that his "butt hurt." (*Id.* at 69). Hoffman explained the incident as follows:

> He was coming out of the bathtub, we were drying him off and putting on his pajamas when he said that his butt hurt. And, I said, well, turn around and let me see, and I said, you know there is no chapping [ ], so and he said, no, it is inside my butt. And I said, oh. And I said, bend over a little bit and let me see, and I thought maybe he was getting another ringworm in that area. And, he bent all the way over and turned around and looked at me and said, my daddy uses KY Jelly in my butt when he puts his fingers there.

---

[1] CPS removed the child and his younger brother from their home pending an investigation into whether they had been neglected by petitioner and his wife.

> Q. [BY PROSECUTOR]: What did you do?
>
> A. The first thing?
>
> Q. Did you pursue it further?
>
> A. I asked him to repeat it to my mother who was visiting for the holidays.
>
> Q. And, what did he say?
>
> A. Same exact thing.
>
> Q. That his daddy uses KY Jelly when he puts his fingers in his butt?
>
> A. Yes, sir.

(*Id.*). Another time, the child told Hoffman that petitioner used a vibrator on his "stinka stinka," pointing to his penis. (*Id.* at 75-76). Hoffman said that the child often exhibited inappropriate sexual behavior and appeared to be obsessed with "butts." (*Id.* at 73-75). During the five or six months he was in foster care, Hoffman observed the child give himself an erection while taking a bath, attempt to insert wash rags up his rectum, touch his brother's penis, and try to put his hand up her husband's shorts. (*Id.* at 73-74). On one occasion, after giving himself an erection in the bathtub, the child stated, "My daddy likes my penis hard and strong." (*Id.* at 91). Hoffman also testified that, during a visit with his parents, the child tried to undo petitioner's belt. (*Id.* at 76). Petitioner responded by telling the child, "Not here[.]" (*Id.* at 77).

Another outcry witness was Suzanne Faulkner, a clinical therapist at the Denton County Children's Advocacy Center, who interviewed the child after Hoffman reported her suspicions of sexual abuse. At their first meeting, the child told Faulkner that his father "stuck his finger in his butt using KY Jelly." (*Id.* at 125). In later sessions, the child volunteered additional information that led Faulkner to conclude he had been sexually abused. Faulkner testified that:

> [The child] told me that his father had made a mistake, that he had touched him all over his body. He told me that his father had touched him with a vibrator on his stinka stinka, which is what he calls his penis, and on his butt. And, he also said that his father had put his penis in his mouth and drank his pee pee.
>
> Q. [BY PROSECUTOR]: I guess, whose penis was put into whose mouth?
>
> A.   That [the child's] was put into his father's mouth.
>
> Q.   And, his father drank his pee pee?
>
> A.   Yes.

(*Id.* at 127-28). Faulkner said that the child experienced anxiety, stomachaches, and diarrhea after visiting with petitioner. (*Id.* at 131). After one three-hour visit, the child went to the bathroom at least five times and told Faulkner that "his butt was red and it hurt." (*Id.* at 130). When questioned by Faulkner about his bottom, the child responded, "my dad, I mean, my butt is scared of something." (*Id.*).

The child also testified at trial. On direct examination, the prosecutor asked the child if petitioner had done some "bad things" to him. (*Id.* at 39-41). The child answered affirmatively. (*Id.* at 41). Upon further questioning by the prosecutor, the child explained:

> Well, he put KY Jelly in my bow-bow and that didn't hurt so, he asked to do that to doctor me, because my daddy is a doctor.
>
> Q. [BY PROSECUTOR]: Oh, he is?
>
> A.   Yeah, he is.
>
> Q.   And, how did he put KY Jelly in your bow-bow.
>
> A.   Well, he had some medicine in the refrigerator, so he got it out and put it in my bow-bow.
>
> Q.   What part of his body did he use to put the KY Jelly in?
>
> A.   His hand.

| | | |
|---|---|---|
| Q. | His hand? | |
| A. | Yeah. | |
| Q. | What part of his hand, can you point at my hand? | |
| A. | He uses it like this. | |
| Q. | Like that? | |
| A. | Yeah, and it was that small. | |

* * * *

| | | |
|---|---|---|
| Q. | Did you feel it? |
| A. | Yeah, it didn't hurt. |
| Q. | It didn't hurt? |
| A. | Yeah, my bow-bow didn't hurt. |
| Q. | Did it go all the way in your bow-bow, though? |
| A. | Yeah. |

(*Id.* at 41-42). The prosecutor then asked the child if petitioner had touched him anywhere else. (*Id.* at 42). The child answered, "I don't know, maybe." (*Id.*). When asked if petitioner ever used a vibrator, the child said his father "used it on my back." (*Id.* at 45). Later, the child described the vibrator in some detail and said that petitioner also used it on his knees and legs. (*Id.* at 47). The child denied that petitioner ever touched him with his mouth or exposed his "private parts." (*Id.* at 44-45, 52).

Three other witnesses testified for the prosecution: (1) Jeffrey Berkowitz, a pediatrician who performed a physical examination on the child while in foster care; (2) Susanne Rogers, a CPS caseworker; and (3) Andrew Ainley, a Duncanville police detective. Dr. Berkowitz said that the results of the child's physical exam were essentially normal, but he did not look for evidence of possible sexual abuse. (*Id.* at 57-58). Rogers testified that the child displayed aggressive behavior

and experienced stomachaches, diarrhea, and nervousness after visits with his father. (*Id.* at 112). Detective Ainley merely established that the alleged sexual abuse occurred in Dallas County, Texas. (*Id.* at 119).

Petitioner elected not to testify. (*See id.* at 189). Instead, the defense called two witnesses. William East, a CPS caseworker, testified that he visited the child and his brother in foster care to investigate a report that their grandfather may have sexually abused them. (*Id.* at 147-48). In his notes from that visit, East wrote that the child had trouble distinguishing between reality and fantasy and tended to confuse certain facts and events. (*Id.* at 155-56). Ultimately, East was unable to reach a definitive conclusion as to whether the child was abused by his grandfather. (*Id.* at 156). Patricia Wheelahan, a pediatrician who treated the child before he was placed in foster care, was asked whether she prescribed suppositories to children. Dr. Wheelahan responded that she might prescribe Phenergan suppositories for vomiting and recommend Feverall, an over-the-counter suppository, for fever. (*Id.* at 168). Defense counsel then asked Dr. Wheelahan to describe the procedure for inserting a suppository:

> Q. [BY DEFENSE COUNSEL]: If you could then Dr. Wheelahan, could you read the directions for the administration of the suppository?
>
> A. Okay. Find right dose on chart below, remove wrapper, carefully insert suppository well up into the rectum.
>
> Q. Those directions obviously, those directions would be given to the parent, to the child or custodian?
>
> A. Right.
>
> Q. And, by doing that, you would use, how would you do that, would you use your finger or instrument or how would you do that?
>
> A. Yeah, usually your finger, you know, you may or may not put a glove on and you may or may not. I usually would tell people to put like vaseline [sic] or some sort of lubricant on it so, it would go easier.

> Q. So, what you are saying is you usually tell your patients to use lubricant to insert the suppositories, correct?
>
> A. Right.
>
> Q. Would KY Jelly be something that would be appropriate to use?
>
> A. Yeah.

(*Id.* at 168-69). Relying on her treatment notes, Dr. Wheelahan testified that the child experienced vomiting and diarrhea in October 1996 and May 1997, and had a 103-degree fever with vomiting in October 1999. (*Id.* at 175, 187-88). Although she could not find a specific reference to suppositories in her notes, Dr. Wheelahan acknowledged that "I won't always write down give suppository, but I may have told [petitioner], because anytime a child has a high fever or a fever they can't get down with oral medication or if they are vomiting, I will say use a suppository." (*Id.* at 177). Dr. Wheelahan also testified that she diagnosed the child with Candida, a type of yeast infection, in October 1999. (*Id.* at 171, 179). To treat this condition, she prescribed Nystatin ointment, which is applied "with your finger around the anus." (*Id.* at 171).

The jury convicted petitioner on both counts of aggravated sexual assault of a child. The state appeals court affirmed, specifically finding that the outcry statements made by the child were admissible and that the evidence was legally and factually sufficient to support the verdict. *Tear*, 74 S.W.3d at 559-61. After the state court denied post-conviction relief, petitioner filed a *pro se* writ of habeas corpus in federal district court. Respondent answered the habeas petition and submitted a copy of the state court record. Concerned that petitioner had obscured potentially meritorious claims by advancing multiple frivolous arguments in his *pro se* writ, the court ordered him to rebrief his grounds for relief with the assistance of counsel. The court also held an evidentiary hearing to enable the parties to fully explore the claims asserted by petitioner in his amended writ. Both sides

have had an opportunity to fully brief the issues and present evidence, and this case is ripe for determination.

C.

In his first ground for relief, petitioner contends that his attorney, Julie Jones, was ineffective for failing to subpoena MaLisa Fyffe, a speech therapist who worked with the child for more than a year while he was enrolled in a Preschool Program for Children with Disabilities ("PPCD"). If called as a witness, Fyffe would have testified that the child suffered from an expressive disorder that affected his ability to use language and communicate with others. *See Ex Parte Tear*, WR-58,088-01, Tr. at 112. Her opinion was based, in large part, on the results of a Comprehensive Individual Assessment performed in October 1998. In that assessment, Fyffe wrote:

> [The child] was identified as having a moderate articulation disorder and moderate receptive and expressive language disorder by Connie Tucker, Speech Pathologist, per 10-1-98 assessment results. [The child] began receiving Speech Therapy at Merrifield Elementary in October 1998 to address his speech/language needs. During the play-based Early Childhood assessment session, [the child] was observed to use jargon in unstructured situations. When developmental activities were more adult directed, [the child] used 2 to 4 word phrases and sentences. He used oral language to request toys, activities, a drink, and help. [The child] was able to label and identify many familiar objects, items, and sounds, but did not comment or expand thoughts about these.

*Id.*, Tr. at 269. Petitioner contends that he repeatedly asked his attorney to interview Fyffe. In support of this claim, petitioner points to a 22-page letter to Jones, dated October 31, 2000, wherein he suggested 12 questions or areas of inquiry for a "Ms. Lisa Fite," a teacher at Central Elementary School. *Id.*, Tr. at 95, 103-05. Attached to the letter is a postmarked envelope addressed to "Julie Jones, Attorney at Law, 703 McKinney Ave., Dallas, TX 75202." *Id.*, Tr. at 88. However, in an affidavit submitted to the state habeas court, Jones denied any prior knowledge of Fyffe or the letter. According to Jones:

> Had Mr. Tear informed me of the existence of Ms. Fyffe I would have been more than happy to contact her in person, by phone or through a private investigator. At no time did Mr. Tear request Ms. Fyffe's testimony. In all our meetings Mr. Tear never mentioned Ms. Fyffe. The purported letter attached to Mr. Tear's application was never given to me prior to trial or during the course of my representation of Mr. Tear.

*Id.*, Supp. Tr. at 6. The state habeas court found that petitioner never informed his attorney that Fyffe was a prospective witness who should be interviewed or subpoenaed, and denied post-conviction relief on that basis. *Id.*, Supp. Tr. at 3, ¶ 3. Petitioner challenges that factual determination as unreasonable in light of the evidence presented in the state court proceeding.

1.

The issue of whether petitioner told Jones about Fyffe was the focus of the evidentiary hearing held on March 27, 2008. At the hearing, petitioner testified that he spoke with Jones about Fyffe at least four times prior to trial. (*See* Evid. Hrg. Tr. at 70). Petitioner also said that he sent Jones the letter identifying Fyffe and suggesting questions for the witness. (*Id.* at 70, 91). When asked how he obtained a copy of the letter, petitioner said that Jones returned his entire file at the conclusion of the trial. (*Id.* at 70, 72). The letter was included in the file. (*Id.* at 70). That explanation was confirmed by petitioner's sister, Rosanna Vargas, who testified that Jones handed over all documents given to her by petitioner on the last day of trial. (*Id.* at 104).

In a deposition taken prior to the evidentiary hearing,[2] Jones testified that she would never give any part of her file to a client. (*See* Jones Dep. at 15, 36-37). However, Jones admitted that she was unable to locate the file or any documents from petitioner's trial. (*Id.* at 8-10). Although Jones speculates that the file may have been misplaced when she relocated her office from Dallas

---

[2] Jones, who now lives in Houston, Texas, declined to travel to Dallas for the evidentiary hearing. Her deposition was admitted into evidence at the hearing without objection. *See* Order, 3/28/08.

to Houston, (*see id.* at 9-10), the overwhelming evidence supports petitioner's claim that the file was returned to him. In addition to the testimony of petitioner and his sister, Susan E. Abbey, a handwriting expert, compared handwritten notations on documents that petitioner claims were returned to him by Jones with pleadings signed by Jones in other cases. Abbey concluded that the handwriting on both the documents and the pleadings belonged to Jones. (*Id.*, Pet. Exh. 40 at 2-7). This evidence, together with the fact that Jones no longer has possession of her file, supports petitioner's claim that Jones turned over her file at the conclusion of the trial. Among the documents included in the file was the letter identifying "Ms. Lisa Fite," the child's PPCD teacher, as a potential witness. Had Jones conducted even a cursory investigation based on the information provided by petitioner, she would have easily discovered that the true name of this witness was MaLisa Fyffe. The court therefore finds by clear and convincing evidence that petitioner informed his attorney that Fyffe was a potential witness.[3]

2.

Even if Jones was deficient for failing to interview Fyffe, petitioner cannot prevail on his ineffective assistance of counsel claim without "strong proof of prejudice." *See Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002), *cert. denied*, 123 S.Ct. 1901 (2003). To prove prejudice, petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors." *Id.*, *quoting Strickland*, 104 S.Ct. at 2068. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Soffar v. Dretke*, 368 F.3d 441,

---

[3] The court recognizes that none of the questions suggested by petitioner in his letter to Jones address the child's expressive disorder. The only question that even remotely touched on this issue was, "Could [the child] have cried if he was [sexually abused]?" *See Ex parte Tear*, WR-58,088-01, Tr. at 104. Nevertheless, Jones said that she would have contacted Fyffe had petitioner told her about this witness. *Id.*, Supp. Tr. at 6. Had Jones talked to Fyffe, it is likely she would have learned about the child's expressive disorder.

478 (5th Cir. 2004), *quoting Strickland*, 104 S.Ct. at 2066. Rather, there must be a reasonable probability that counsel's errors affected the outcome of the trial. *Id.* "A reasonable probability need not be proof by a preponderance that the result would have been different, but it must be a showing sufficient to undermine confidence in the outcome." *Id.*, *citing Strickland*, 104 S.Ct. at 2068. *See also Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 1909 (2007); *Williams v. Cain*, 125 F.3d 269, 279 (5th Cir. 1997), *cert. denied*, 119 S.Ct. 144 (1998).

Had Fyffe been called as a witness at trial, she would have testified that the child suffered from an expressive disorder that affected his ability to use language and communicate with others. *See Ex Parte Tear*, WR-58,088-01, Tr. at 112. Petitioner argues that this testimony would have cast doubt on the child's ability to make the outcry statements attributed to him without being manipulated or coached by an adult. Fyffe also would have testified that the child did not demonstrate any significant emotional or behavioral deficits, *see id.*, which petitioner believes would have contradicted the testimony of other witnesses that the child exhibited aggressive, nervous, and highly sexualized behavior.

Although Fyffe may have been a favorable witness for the defense, the court cannot say that her missing testimony undermines confidence in the outcome of the trial. First, the Comprehensive Individual Assessment upon which Fyffe based her opinions was performed in October 1998--more than a year before the child made the alleged outcry statements. *Id.*, Tr. at 268. At the time of the assessment, the child was just three-and-a-half years old. *Id.* While the report stated that the child had language and articulation disorders, they were described as "moderate" rather than severe. *Id.*, Tr. at 269. Part II of the report, an assessment of learning competencies, noted that the child was capable of "[s]peaking in complete sentences of three or more words." *Id.*, Tr. at 276. The results of the Vineland Adaptive Behavior Scales assessment, which measures adaptive behavior, indicated

that the child's communication skills were in the "low average" range relative to individuals of the same age. *Id.*, Tr. at 272. In addition, Fyffe admitted at the evidentiary hearing that the child showed improvement in his ability to communicate during the time she worked with him. (*See* Evid. Hrg. Tr. at 20). Given the ambiguities of the Comprehensive Individual Assessment and the passage of time between the date of the assessment and the dates of the outcry statements, Fyffe's testimony regarding the child's expressive disorder would have been of questionable value.

Second, the jury heard the child testify and observed his demeanor in a highly stressful environment. The child was able to describe exactly what happened to him, telling the jury that petitioner "put KY Jelly in my bow-bow and that didn't hurt so, he asked to do that to doctor me, because my daddy is a doctor." (SF-II at 41). The child went on to explain that petitioner "had some medicine in the refrigerator, so he got it out and put it in my bow-bow." (*Id.*). When asked about the vibrator, the child appeared to be familiar with the device and told the jury how petitioner used it on his body. (*Id.* at 45, 47). Contrary to petitioner's characterization of the child as a linguistically-challenged youngster whose nonsensical ramblings were indecipherable to adults, the record indicates that the child was able to communicate his thoughts and explain events with little or no difficulty.

Nor is it likely that Fyffe would have been able to convince the jury that the child fabricated his allegations of sexual abuse against petitioner. In her affidavit, Fyffe stated that the child's language, articulation, and socialization disorder resulted in his "fabrication of information and history of making false abuse claims." *Ex Parte Tear*, WR-58,088-01, Tr. at 112. However, at the evidentiary hearing, Fyffe conceded that there is no connection between any of these disorders and the ability to tell the truth. (*See* Evid. Hrg. Tr. at 45). Moreover, other evidence before the jury suggested that the child had a propensity to fabricate or embellish events. William East, a CPS

caseworker, testified that the child had trouble distinguishing between reality and fantasy, tended to confuse certain facts, and falsely claimed that his grandfather had abused him. (*See* SF-II at 155-56). Fyffe's testimony on this issue would have been cumulative, and less persuasive, than East's testimony.

To the extent Fyffe would have testified that the child never exhibited any significant emotional or behavioral problems, such testimony would have only minimal probative value. Fyffe did not work with the child during the five or six months he was in foster care. (*See* Evid. Hrg. Tr. at 22). In fact, it is not clear whether Fyffe ever saw the child while he was living with Kathleen Hoffman. (*See id.* at 32). That Fyffe did not observe any significant emotional or behavioral problems during the time she worked with the child does not mean that the child never exhibited inappropriate sexual behavior while he was in foster care.

In sum, petitioner has not shown that he was prejudiced by the failure of defense counsel to subpoena MaLisa Fyffe. Although petitioner identified Fyffe as a potential witness in a letter to his attorney, the court is unable to conclude that there is a reasonable probability the outcome of the trial would have been different had Fyffe testified. This ground for relief should be overruled.

D.

Petitioner also criticizes his attorney for failing to call Linda Scott, a nurse who worked for the child's pediatrician, Dr. Wheelahan. In an affidavit submitted to the state habeas court, Scott proffered the testimony she would have given if called as a witness at trial:

> I was aware of [the child's] numerous medical conditions, and could have testified to such, such being: Frequent ear, nose, throat, upper respiratory tract[,] perineal candida infections, often with the presence of fever, also frequent gastro intestinal complaints of nausea, vomiting, diarrhea, constipation, abdominal pain, frequent earaches, headaches, allergies to diaper wipes necessitating the use of wash clothes, (to clean his perineal area), developmental delay and deficits in speech and articulation, (this is not an all inclusive list).

> At no time did [the child] ever appear to be either physically or sexually abused.
>
> I did recommend and instruct Mr. Tear in the use of Acetamenophen (Tylenol/Feverall) suppositories, and the use of K-Y type lubricant as, part of our clinic's standard operating procedure in the event of fever in the presence of vomiting.

*Ex parte Tear*, WR-58,088-01, Tr. at 114-15. Although Jones subpoenaed Scott, she did not testify. Instead, Jones relied exclusively on the testimony of Dr. Wheelahan. According to Jones:

> The only reason I subpoenaed Ms. Scott was in the event Dr. Wheelahan could not be in Court, Her nurse, Ms. Scott could testify from the Doctors reports. On the day of trial both Ms. Scott and Dr. Wheelahan were present. Not only did I inform the Defendant that both were in court, He physically saw both Dr. Wheelahan and Ms. Scott sitting in the court room during a break in trial. As the treating physician Dr. Wheelahan's testimony was far superior. The nurse had less knowledge concerning [the child] and far less credibility. Ms. Scott could not have given expert opinion concerning diagnosis. It was my opinion that calling the nurse in addition to Dr. Wheelahan would have diminished the testimony that was given to establish the medical defense. After an interview with Ms. Scott I concluded she would not stand up during cross. Any testimony she could have given Dr. Wheelahan provided in a much more cohesive and credible manner.

*Id.*, Supp. Tr. at 6. The state habeas court accepted this explanation, specifically finding that Scott's testimony would have been cumulative of her employer's. *Id.*, Supp. Tr. at 3-4, ¶ 3.

The *Strickland* standard is highly deferential to strategic choices made by trial counsel. "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance." *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003), *cert. denied*, 124 S.Ct. 1417 (2004). A conscious and informed decision on trial tactics cannot form the basis of an ineffective assistance of counsel claim "unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Id.* at 753; *see also United States v. Jones*, 287 F.3d 325, 331 (5th Cir.), *cert. denied*, 123 S.Ct. 549 (2002).

The record shows that Jones interviewed Scott on at least three different occasions. (Resp. Am. Answer, Exh. B at 2; *see also* Jones Dep. at 65-66). Two of those conversations occurred outside the courtroom during trial. (Jones Dep. at 66). When Jones asked Scott if she ever gave petitioner specific instructions on how to insert a suppository, Scott reluctantly admitted that she did not. Instead, Scott said that "Dr. Wheelahan and herself generally tell patients to use over-the-counter suppositories if they have got a stomach problem[.]" (*Id.* at 67). This is essentially the same testimony given by Dr. Wheelahan at trial. (*See* SF-II at 177). Dr. Wheelahan also testified that the child experienced vomiting and diarrhea in October 1996 and May 1997, had a 103-degree fever with vomiting in October 1999, and was diagnosed with a yeast infection in October 1999. (*Id.* at 171, 175, 179, 187-88). The testimony proffered by Scott in her affidavit provides no additional information about the child's medical problems. Thus, petitioner has failed to rebut the state court finding that Scott's testimony would have been cumulative of her employer's.

Jones also explained that Scott would have been an "awful witness." (Jones Dep. at 67). During their interview sessions, Jones could not prevent Scott from "interjecting how unfair she thought the trial was, how sorry she felt for Mr. Tear and what a great father he had been." (*Id.*). Had Scott expressed those opinions at trial, it would have allowed the state to introduce evidence that petitioner was under investigation for child neglect--evidence that Jones successfully kept out of the case. (Resp. Am. Answer, Exh. B at 2; *see also* Evid. Hrg. Tr., Resp. Exhs. 2 & 3). Moreover, Scott's testimony could have damaged the credibility of Dr. Wheelahan. (*See id.*, Exh. B at 2). It is clear that the risks associated with calling Scott as a witness far outweighed any benefit her cumulative testimony could have provided. This sound strategic decision, made after a thorough investigation of the facts, cannot form the basis of an ineffective assistance of counsel claim. *See Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994), *citing Strickland*, 104 S.Ct. at 2066 (strategic

choices based on information gathered from a thorough investigation of the facts and law "are virtually unchallengeable").

E.

Finally, petitioner contends that his attorney was ineffective for failing to challenge the expert testimony offered by Suzanne Faulkner. Although Jones objected that Faulkner should not be allowed to testify about any hearsay statements made by the child, (*see* SF-II at 106-08), petitioner now claims that his attorney should have objected that Faulkner was not qualified to give expert testimony regarding the behavior of child sex abuse victims. This argument is without merit. Faulkner is a clinical therapist who, at the time of trial, had treated between 50-100 children for problems related to sexual abuse. (*Id.* at 96). She has a masters degree in psychology and worked at the Denton County Children's Advocacy Center for three years, including a one-year internship. (*Id.*). Under Texas law, those credentials were sufficient to qualify Faulkner as an expert. *See, e.g. Foxworth v. State*, No. 10-04-00209-CR, 2005 WL 2300346 at *4 (Tex. App.--Waco, Sept. 21, 2005, pet. ref'd); *Mulvihill v. State*, 177 S.W.3d 409, 413 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd); *Malone v. State*, 163 S.W.3d 785, 792-94 (Tex. App.--Texarkana 2005, pet. ref'd); *Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.--Houston [1st. Dist.] 2001, pet. ref'd). Had Jones objected to Faulker's qualifications, the objection likely would have been overruled. The failure to assert this meritless objection does not constitute ineffective assistance of counsel. *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997), *cert. denied*, 119 S.Ct. 418 (1998).[4]

---

[4] To the extent petitioner argues that Jones should have objected to Faulkner's testimony "regarding the truthfulness of child sex victims in general and the victim in particular," (*see* Pet. Am. Writ at 30), that claim is unexhausted and procedurally barred.

## RECOMMENDATION

Petitioner's application for writ of habeas corpus should be denied.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party may file written objections to the recommendation within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The failure to file written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: May 1, 2008.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE